IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>J.W. | No. 81789-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUN, J. — Police arrested J.W. after he allegedly threatened to stab a person with a knife. After the arrest, J.W. spat blood and saliva into the eyes of an emergency medical technician (EMT). The State petitioned to commit J.W. for 14 days of involuntary treatment for a mental disorder. The trial court found that because of a mental disorder, J.W. posed a likelihood of serious harm to others and granted the State's petition. For the reasons discussed below, we affirm.

## I. BACKGROUND

In July 2020, during the COVID-19 pandemic, at a park, J.W. allegedly threatened to cut and stab a person with a knife. Police arrived and handcuffed him. During the arrest, J.W. resisted by dropping to the ground, refusing to stand up, and kicking out his legs. J.W. did not comply with the officers' commands, screamed and wept while they forcibly searched him, and said that he would not let them take him to jail. J.W. also bled from his lip from an unknown prior injury. Police called for assistance from an EMT unit, after which the EMTs placed J.W.

Citations and pin cites are based on the Westlaw online version of the cited material.

on a gurney, strapped him down by his wrists and legs, and took him to a hospital.

At the hospital, after the EMTs removed J.W.'s restraints, he immediately spat in the unprotected eyes of the EMT driver and the protected eyes of another EMT. J.W.'s spit was mixed with blood. The EMT driver followed exposure protocol and was admitted to the hospital; the EMTs and police learned after J.W. was admitted to the hospital that J.W. had tested positive for COVID-19. J.W. continued to try to get out of his restraints and made threats to kill hospital staff members.

J.W. was taken to jail and later given a psychiatric evaluation by a nurse and other health providers. Following the evaluation, the State petitioned to involuntarily commit J.W. for a 14-day period.

At the commitment hearing, a counselor who evaluated J.W. for the commitment petition testified that J.W. suffered from "bipolar disorder type 1 versus schizoaffective disorder bipolar type." She testified that J.W.'s impairment had a substantial effect on his cognitive and volitional function, and that he presented a substantial risk of harm to others because of the disorder. She also testified that he had a labile mood, responded to internal stimuli, responded to those stimuli during the hearing, and had command auditory hallucinations. And she referred to his medical records, which show that he told another doctor,

> "They say I have something, that I am crazy, but people want to stay around me." "I am a baby from the galaxy and people say that I have something. That's why I came. I did not want to do the things I did not want to do."

> "I slept with a monkey. I can do things because I am good. The things do with their penis and women with their vaginas." "I came from the time from the replicon, and I am doing too good." "The police saved me by taking me in, but they should have told me that I needed to leave." "I came from space, and there is accounted for as being outside of us." "You are making me feel that I have pain because you keep doing this thing and keep asking me these questions."

She also read aloud a portion of his medical records indicating he denied homicidal ideation but "continuously describe[d] how he would hurt others if they hurt him," and another portion stating that "[h]e believes he does not require medication and has no mental health history." And she read another record indicating he told a nurse, "I feel like hurting everybody," and that he can control others' lives and actions. And another record showed that a doctor had placed him in "[s]exual aggression precautions" because he had masturbated in a public area of the mental health treatment facility.

The counselor testified that she based her opinion that J.W. presents a substantial risk of physical harm to others on the events leading to his arrest, his resistance to arrest, spitting in and at the eyes of EMTs during a pandemic, his sexual inappropriateness while in treatment, his command auditory hallucinations, and his labile mood. She also opined that his presentation at the hearing led her to believe that he was still a harm to others, because he had been responding to internal stimuli and had been talking under his breath about death and dying. She noted that J.W. could follow complex directions and his nursing records showed that his risk of violence was small, but that those facts did not change her assessment.

3

The trial court found that as the result of a mental disorder, J.W. presents a likelihood of serious harm to others. It also found that

[J.W.] currently suffers from a mental, emotional or organic impairment (working diagnosis: Bipolar Disorder, type 1 vs. schizoaffective disorder, Bipolar type) which has had a substantial adverse effect upon [J.W.]'s cognitive and volitional functioning as evidenced by the following symptoms and presentation: labile, tangential, responding to internal stimuli, paranoid, and delusional.

[J.W.] presents a substantial risk of physical harm to others. During an arrest process, [J.W.] started screaming, crying, rolling on the ground and refusing to cooperate. He continued his resistance at the hospital where he threatened to kill staff for several hours. At one point, [J.W.] spit in the face of two EMT workers—one masked and one unmasked. [J.W.] was bleeding from a lip injury. This was irrational behavior that went beyond merely not wanting to be arrested. Spitting constitutes an assault, the application of force which is highly offensive, and which has caused physical harm.

At the hospital, [J.W.] stated he was a baby from another galaxy; that he came from replicon, that he came from space, that he feels like hurting everyone and that he hears voices telling him things. During the hearing, [J.W.] was responding to internal stimuli.

The court finds that a less restrictive order is inappropriate and not in the best interests of [J.W.] or the community because he is not stabilized and still exhibits active symptoms of his mental impairment with no insight.

The trial court involuntarily committed J.W. for a period not to exceed 14 days.

J.W. appeals.

## II. ANALYSIS

J.W. says that insufficient evidence supports the trial court's finding that as a result of a mental disorder, he presented a likelihood of serious harm to others, so the trial court erred in involuntarily committing him. He also says the State failed to show that he committed any recent overt act demonstrating that he

4

posed a substantial risk of harm to other people, so we should reverse the commitment order. We disagree with his arguments.

When reviewing a trial court's commitment order, we decide whether substantial evidence supports the findings of fact, and if so, whether those findings support the conclusions of law and judgment. In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise,'" and "[t]he party challenging a finding of fact bears the burden of demonstrating the finding is not supported by substantial evidence." In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 P.2d 621 (1978)).

To involuntarily commit a person for a 14-day period, a court must find by a preponderance of the evidence that the person, "as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled." RCW 71.05.240(4)(a). A likelihood of serious harm is

> (a) A substantial risk that: (i) Physical harm will be inflicted by a person upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself; (ii) physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (iii) physical harm will be inflicted by a person upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others; or
>
> (b) The person has threatened the physical safety of another and has a history of one or more violent acts.

A substantial risk of harm must be evidenced by a recent overt act that "caused harm or creates a reasonable apprehension of current dangerousness." In re

Det. of Harris, 98 Wn.2d 276, 284–85, 654 P.2d 109 (1982); In re Det. of Albrecht, 147 Wn.2d 1, 7, 51 P.3d 73 (2002).  Under RCW 71.05.245(3), "recent" refers to the period up to three years before the hearing.

   A.  Physical Harm or Reasonable Fear of Physical Harm

       J.W. says the State did not prove he caused physical harm or placed anyone in reasonable fear of physical harm as a result of his mental disorder, so insufficient evidence supports the trial court's finding that he presented a likelihood of serious harm to others.  Because a fair-minded person could conclude the State showed by a preponderance of the evidence that J.W. caused physical harm to another person as a result of his mental disorder, we disagree.

       An officer present at J.W.'s arrest and later hospitalization testified at the hearing that J.W. repeatedly stated he did not want to be taken to jail, that he "seemed like a criminal who was trying not to be arrested," and that he "purposefully" spat at the EMTs' faces.  The officer also testified that J.W. was hospitalized because of his injured lip and did not testify that J.W. was hospitalized because of mental health symptoms.  J.W. says that this shows that his actions on the day of his arrest did not stem from a mental disorder but instead were purposeful and volitional, and that no other facts show his actions stemmed from a mental disorder.

       But the evidence at the hearing also showed that, during his arrest, J.W. screamed, wept, and writhed on the ground.  At the hospital, J.W. threatened to kill hospital employees and—during a pandemic and while COVID positive—spat bloody saliva at the eyes of two EMTs, hitting one directly in an unprotected eye,

6

leading to the EMT's hospitalization. These facts constitute substantial evidence supporting the trial court's finding that J.W.'s behavior on the day of his arrest went beyond "merely not wanting to be arrested" and that he acted irrationally. Given this irrational behavior—which caused physical harm to another person—and given the counselor's subsequent testimony diagnosing him with a mental health disorder, a fair-minded person could conclude the State showed by a preponderance of the evidence that as a result of his mental disorder J.W. caused physical harm to another person.

B. Recent Overt Act

J.W. says the State failed to show by a preponderance of the evidence that as a result of a mental disorder, he committed a recent overt act showing a substantial risk of harm. He also says his behavior while hospitalized belies any claim that he is currently dangerous. Thus, he says we should reverse the commitment order. We disagree.

J.W.'s arrest occurred about a month before the commitment hearing, which is within the three-year time frame set forth in RCW 71.05.245(3). As discussed above, and contrary to J.W.'s assertions otherwise, his spitting on the EMT driver constituted harm to another person as a result of his mental disorder and serves as a recent overt act evidencing a substantial risk of harm.

We also disagree with J.W.'s assertion that his behavior while hospitalized belies a claim that he was dangerous at the time of the hearing. The evidence showed that, while hospitalized, he told a doctor that he "feel[s] like hurting everybody," spoke about his delusions that he was from a different galaxy, and

7

was placed in sexual aggression precautions because of public masturbation. The mental health evaluator testified that during the commitment hearing, J.W. responded to internal stimuli and spoke under his breath about death and dying. All these facts—which the trial court entered as findings that a fair-minded person could determine are supported by the preponderance of the evidence—constitute recent overt acts that show J.W.'s substantial risk of harm to others.

Because a fair minded person could conclude the State showed by a preponderance of the evidence that as a result of his mental disorder, J.W. presents a likelihood of serious harm to others, we affirm.

_____Chun, J._____

WE CONCUR:

_____Smith, J._____     _____Dwyer, J._____

8